UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT STULTZ,

        Plaintiff,

vs.

J.B. HUNT TRANSPORT, INC.,

        Defendant.
_____/

Civil Action No.
13-CV-13705

Honorable Patrick J. Duggan

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I. INTRODUCTION

This case is brought under the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 *et seq*. Plaintiff Robert Stultz claims that his former employer, Defendant J.B Hunt Transport, Inc., failed to pay him overtime wages for hours worked in excess of forty hours per week from January 16, 2011 through July 12, 2013, the time during which Plaintiff worked for Defendant as a "parts manager." Although the FLSA generally requires overtime pay for each hour worked in excess of forty hours per week, Defendant argues that it was not required to pay Plaintiff overtime under the so-called administrative exemption, which is codified at 29 U.S.C. § 213(a)(1). Under that exemption, employers do not have to pay overtime wages to "any employee employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1).

The Court held a bench trial on May 15 and 19, 2014, during which the Court heard testimony from three witnesses: Plaintiff, Richard Mumm, Defendant's maintenance manager and Plaintiff's supervisor, and Veral Noland, Defendant's tire program manager. For the reasons

that follow, the Court concludes that the administrative exemption does not apply in this case and that, accordingly, Defendant was required to pay Plaintiff overtime wages for hours worked in excess of forty hours per week.  The Court further finds that the two-year statute to limitations applies in this case – and not the three-year statute of limitations – because Plaintiff failed to satisfy his burden of proving that Defendant's violation of the FSLA was willful, and that Plaintiff is entitled to liquidated damages because Defendant failed to satisfy its burden of proving that liquidated damages are inappropriate.

## II.  LAW AND THE PARTIES' ARGUMENTS

The administrative exemption covers employees:

(1) Compensated . . . at a rate of not less than $455 per week . . . ;

(2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and

(3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200(a).  It is undisputed that "[t]he [administrative] exemption is to be narrowly construed against the employer, and the employer bears the burden of proving each element by a preponderance of the evidence."  *Foster v. Nationwide Mut. Ins. Co.*, 710 F.3d 640, 642 (6th Cir. 2013).

The parties agree that the first element of § 541.200(a) is satisfied, but disagree on the remaining two elements.  Regarding the third element, the regulations provide the following guidance on the meaning of "discretion and independent judgment" for purposes of § 541.200(a)(3):

- "In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered."  29 C.F.R. § 541.202(a).

2

- "The exercise of discretion and independent judgment implies that the employee has authority to make an independent choice, free from immediate direction or supervision. However, employees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level. *Id.* § 541.202(c).

- "The exercise of discretion and independent judgment must be more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources." *Id.* § 541.202(e).

### III. ANALYSIS

#### A. Plaintiff's Job Duties as Parts Manager

Plaintiff held several positions during his employment with Defendant, but seeks overtime wages in this lawsuit only for overtime worked while Plaintiff held the position of parts manager, which was from January 16, 2011 through July 12, 1013.[1] The evidence adduced at trial reflects that Plaintiff performed the following duties while working as a parts manager: (1) scrap audits; (2) fleet inspections and terminal audits; (3) shipped, received, and issued parts; (4) cycle counts; (5) end-of-year inventories; (6) participated in a think tank; (7) briefly performed some of the roles of regional tire manager; (8) trained employees; and (9) ordered supplies. The Court addresses each of these roles, in turn, for the purpose of determining whether they involved the exercise of discretion and independent judgment with respect to matters of significance for purposes of § 541.200(a).

#### 1. Scrap Audits

Plaintiff testified that he performed scrap audits for Defendant in Ohio and elsewhere approximately once every four months in the winter and every other month in the summer. Plaintiff originally started performing scrap audits as a tire utility because his expertise in tires was apparent to Defendant's management soon after he began working for Defendant in 2005.

---

[1] Plaintiff began working for Defendant as a "tire utility" in April 2005. After about a year, Plaintiff was promoted to the position of "tire journeyman."

3

At trial, Plaintiff explained the nature of scrap audits and his role in the process. Defendant sends its used tires to certain vendors around the country for a determination whether they should be scraped or retreated/repaired for further use. Once enough tires accumulated at a given vendor site, the vendor would call Plaintiff, at which time Plaintiff would seek permission from his supervisor to travel to the vendor site. Plaintiff testified that he would get fired if he went to a vendor site without seeking permission, and that there were times when his boss told him to "put it off" for a period of time. When he arrived at the vendor site, Plaintiff would "check in and see the retread manager," who would "point to a pile of tires that have been scrapped out" (*i.e.*, deemed by the vendor to be unfit for further use). Plaintiff's role as a scrap auditor was to examine each scrapped tire to make sure that the vendor had correctly deemed that tire unfit for further use. Richard Mumm, Defendant's maintenance manager and Plaintiff's supervisor, described Plaintiff's role as a scrap auditor in a similar fashion:

> You're making justification or I should say the observation and decision on if a tire is warrantable, when the scrapper has got it listed as non-warranty. You are . . . you discuss that issue to try to get our warranty returns.

In determining whether the vendor had correctly scraped a tire, Plaintiff applied the retreading standards set out in a manual that was given to him by Defendant called "tire university." According to Plaintiff:

> [E]verything was state[d] to me [in tire university] what could be kept again [retreaded] and what couldn't be kept again. . . . There's a tire university book that outlines, it's like 12 chapters from everything how to fix a tire, how to do a scrap audit, the size of the injuries that they go by, the casings age on the casings that's capable for a drive tire for a trailer tire, it's all outlined.

Plaintiff testified that he was not permitted to deviate from the guidelines set forth in tire university. In other words, Plaintiff was given authority to make the decision whether the vendor had properly scraped each tire, and Defendant relied on that decision; however, Plaintiff applied

4

the standards set forth in tire university to make his determination and was not permitted to deviate from those standards. If Plaintiff thought that the vendor had incorrectly deemed a tire unfit for retreading, he would set that tire aside and ask the vendor to check it again in his presence. According to Plaintiff, "a lot of times" the vendor would find something on the second review that Plaintiff did not find, and the tire would again be put in the scrap pile. If Plaintiff still disagreed with the vendor about the retreadability of a tire after the vendor reviewed it a second time, Plaintiff would "make a phone call" to his supervisor, who would tell Plaintiff "to leave [the tire] to the side and we'll take care of it." In the event of this kind of dispute, Plaintiff "had no role in [resolving it] at all."

Mr. Mumm testified that Plaintiff exercised discretion and independent judgment as a scrap auditor for the following reasons:

> When that person goes to that location he's the sole person that represents J.B. Hunt. And he's there to ensure that all our company policies, procedures are being followed at that location. He ensures that we are getting the correct product we are paying for. And he's ensuring that we're getting an honest return on our warranty dollars.

Veral Noland, Defendant's tire program manager, also testified that Plaintiff's responsibilities as a scrap auditor involved the exercise discretion and independent judgment. According to Mr. Noland, situations arise every so often in the field that are not covered by tire university and Plaintiff was required to make decisions "on the fly" using his expertise in tires:

> [Y]ou can't make a guideline and rule for every situation that comes up in the field. So, we have guidelines, but inevitably, there's a situation that's going to come up where they're going to have to make a decision and they do that everyday.

\* \* \* \*

> [M]ost of the common ones [tire issues] are in tire university. There's a whole host of them that aren't in tire university and industry knowledge is the only thing that's going to point you to them.

5

Thus, Mr. Noland's position is that Plaintiff, in performing scrap audits, "use[d] his special skills and knowledge to apply standards that are set by [either] J.B. Hunt [in tire university] or the industry to the tires he was examining."

The Court finds that the scrap auditor function performed by Plaintiff did not involve the exercise of discretion or independent judgment. Both Mr. Mumm and Mr. Noland testified that the scrap auditor function is an extremely important one; the Court does not doubt that. The Court finds that Plaintiff was, indeed, Defendant's last line of defense, ensuring that Defendant received an honest return on its warranty dollars, and that Defendant relied on Plaintiff as its sole representative to protect its interests. However, the words "discretion and independent judgment" are words with a legal meaning and the opinions of Mr. Mumm and Mr. Noland on whether Plaintiff's scrap auditor function qualifies are, of course, not binding on the Court. As mentioned, the regulations provide that "[t]he exercise of discretion and independent judgment must be more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources." 29 C.F.R. § 541.202(e). Mr. Noland's testimony, quoted at the end of the preceding paragraph, confirms that Plaintiff's scrap auditor role involved nothing more than applying established standards – either standards set forth in tire university or established industry standards – to the tires he was examining. The fact that Plaintiff was exceptionally good at doing this – and all of the evidence indicates that he was – is irrelevant. The evidence is undisputed that Plaintiff was not permitted to deviate from the standards set forth in tire university, and that he had to seek permission from his superior to travel to a scrap audit site. The evidence also reflects that Plaintiff did not have a role in ultimately resolving a disagreement about the retreadability of a tire. These factors support the Court's finding that Plaintiff's scrap auditor function did not involve the exercise of discretion or

6

independent judgment. For all these reasons, the Court finds that Defendant did not meet its burden of establishing that Plaintiff's scrap auditor function involved the exercise of discretion or independent judgment.

### 2. Fleet Inspections & Terminal Audits

Plaintiff testified that he began performing fleet inspections before he became a parts manager and continued performing them as a parts manager. Plaintiff testified that he did not decide when and where fleet inspections should be performed, and he needed to seek permission from his supervisor before traveling to a site to perform a fleet inspection. Fleet inspections involved traveling to one of Defendant's facilities, randomly selecting twenty trucks and twenty trailers at that facility, measuring the tread depth and checking tire pressure, and recording and reporting the result.

While at the facility, Plaintiff also conducted terminal audits. In a terminal audit, Plaintiff completed an evaluation form that was furnished to him, essentially grading the efficiency and organization of the facility for the purpose of making sure Defendant's guidelines were being followed. Plaintiff performed about five or six fleet inspections and terminals audits per year while he was a parts manager. Mr. Mumm testified that fleet inspections "absolutely" involve the exercise of discretion. When asked to elaborate, Mr. Mumm stated:

> When a person does a facility audit he picks his equipment that he's doing random inspection on. He inspects that equipment and makes notations on if he's found any issues with those units. He also inspects the storage facility of where they keep their tires. He checks to make sure that the procedures are being followed correctly, and also the inventory is correct.

The Court finds that fleet inspections and terminal audits did not involve the exercise of discretion and independent judgment. The task of randomly selecting twenty trucks and twenty trailers does not involve the exercise of discretion and independent judgment because it does not

7

involve "comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." 29 C.F.R. § 541.202(a). Further, the evidence does not reflect that Plaintiff was doing anything "more than . . . us[ing] [his] skill in applying . . . specific standards described in manuals or other sources" in taking tire measurements during fleet inspections and in conducting terminal audits. *Id.* § 541.202(e). For these reasons, the Court finds that Defendant did not meet its burden of establishing that Plaintiff exercised discretion or independent judgment in conducting fleet inspections or terminal audits.

### 3. Shipping, Receiving & Issuing Parts

One of Plaintiff's primary duties as parts manager was receiving, shipping, and issuing parts. Receiving parts involved unloading parts from a truck, signing for them, checking them in, and putting them in the correct bin location. Shipping parts involved receiving an order or request for a part to be shipped, packaging it, filling out a shipping slip, and loading the part onto a truck. Plaintiff also issued parts to mechanics or tire technicians pursuant to their requests.

Plaintiff's superior, Richard Mumm, testified that Plaintiff exercised discretion and independent judgment while performing his shipping/receiving duties because Plaintiff "had to make sure that th[e] whole order had been received" and, "[i]f it was not, he had to make the decision to inform the correct people in our part's department of the shortage and enter those numbers in."

The Court finds that Plaintiff's duties in receiving, shipping, and issuing parts did not involve the exercise of discretion or independent judgment. The Court finds that these duties were largely perfunctory. Mr. Mumm essentially testified that these duties involved the exercise of discretion or independent judgment simply because the job required Plaintiff to do something (*i.e.*, to make sure whole orders were received, which presumably involved comparing the items

received with the items ordered, and informing the correct people if there was a problem). There is no evidence that these duties involved any evaluation of options or choice of any kind. For these reasons, the Court finds that Defendant did not meet its burden of establishing that Plaintiff's duties in shipping, receiving, or issuing parts involved the exercise of discretion or independent judgment.

### 4. Cycle Counts

Another one of Plaintiff's primary duties as parts manager was performing cycle counts, which involved making sure the quantity of a particular part on hand matched the quantity listed in Defendant's computer system. If there was a discrepancy, Plaintiff would try to research it, depending on the value of the part, but did not have the authority to adjust inventory levels "until you at least let your manager know that there is a problem." Plaintiff performed cycle counts on a daily basis.

The Court finds that Defendant failed to meet its burden of establishing that Plaintiff's performance of cycle counts involved the exercise of discretion or independent judgment because there is no evidence that the process involved the evaluation of options followed by a reasoned decision.

### 5. End-of-Year Inventory

Plaintiff performed a comprehensive parts inventory once every year while he was a parts manager, counting parts on hand and checking that number against the quantity of that part listed in the computer. Plaintiff described this as a "glorified cycle count" in which all parts in the facility were counted. Plaintiff recorded his results and submitted a final report to "the corporate people," who would then adjust inventory levels as necessary. Plaintiff did not have the authority to "reconcile anything at inventory time." Mr. Mumm testified that the these annual

9

inventories took two-days and that Plaintiff was in charge and gave direction to others, including Mr. Mumm, on how to conduct the inventory process. Mr. Mumm testified that Plaintiff exercised discretion and independent judgment while conducting these inventories in the following way:

> After parts have been counted, a variance report is created to find out any discrepancies that may be found in our inventory. At that point, we do a recount on those variances to assure that it wasn't human error that caused the variance. Once we figured out that that wasn't the issue, then we go in and investigate that part number, we pull the history up, see what the usage is, possible work orders that were not . . . that parts were not charged out correctly or missed at all . . . and we would make some corrections in that aspect, if possible. If not, then a variance report would be sent out by Mr. Stultz and will be adjusted accordingly by the inventory group.

Further, Mr. Mumm testified on cross-examination that Plaintiff exercised discretion and independent judgment in performing year-end inventories because "each one of [the tasks for which Plaintiff was responsible] required some sort of intelligence and thought and . . . discretion." But when pressed on what sort of discretion (*i.e.*, choice) is involved, Mr. Mumm was unable to provide an example of any choice that Plaintiff was charged with making during the year-end inventory process.

The Court finds that Plaintiff's performance of year-end inventories did not involve any significant exercise of discretion or independent judgment. The evidence reflects that most of the time that Plaintiff spent performing year-end inventories was devoted to simply counting inventory and comparing the quantity on hand to the quantity listed in the computer. This function did not involve any discretion or independent judgment. In the event of a variance, Mr. Mumm's testimony suggests that Plaintiff's responsibilities at that point may have involved some thought, but the testimony does not reflect that Plaintiff was ever charged with making a choice between two or more options that were available to him. Plaintiff merely followed

10

Defendant's procedures in handling a variance. When the time came for someone to make what could be considered a choice – whether to adjust the inventory levels – Plaintiff's involvement in the process had already ended.

Mr. Mumm's testimony that Plaintiff was in charge of the year-end-inventory process and gave direction to others suggests that Plaintiff may have been making some decisions in delegating duties and instructing others. However, Defendant failed to develop that theory at trial, leaving no evidence on which the Court could rely to conclude that this aspect of Plaintiff's job involved discretion and independent judgment. Even had Defendant done so, it would not have mattered because Defendant bears the burden of proving that Plaintiff's "primary" duties involved the exercise of discretion and independent judgment, and year-end inventories only occupied Plaintiff's time for two days out of the year. For these reasons, the Court finds that Defendant failed to meet its burden of establishing that Plaintiff's performance of year-end inventories involved the exercise of discretion or independent judgment.

### 6. Participation in Think Tank

Plaintiff participated in a think tank, beginning six months before he became a parts manager. Plaintiff testified that his participation in the think tank involved a conference call once every three months for about an hour. Plaintiff described the session generally as "an air out B.S. session," to "relieve stress," but remembers discussing on one occasion "[m]ore efficient ways of doing a cycle count." Mr. Mumm testified that the participants comprised "top" parts managers who were

> handpicked" based on their "extraordinary input and knowledge" for the purpose of "discuss[ing] issues throughout the parts world and J.B. Hunt Corporate and any . . . improvements that would be needed. Maybe vendor changes, issues with parts, that type of thing.

11

However, Mr. Mumm admitted on cross examination that he was not a participant in the think tank and had no first-hand knowledge of Plaintiff's role in the group.

The Court finds that Defendant failed to satisfy its burden of proving that Plaintiff's participation in the think tank involved the exercise of discretion or independent judgment. The undisputed testimony from Plaintiff reflects that the majority of the one-hour session was spent venting. To the extent there were productive discussions, if at all, Defendant has not shown that such discussions involved a "matter of significance" or that Plaintiff's specific input in any way involved his use of discretion or independent judgment. In any event, the amount of time that Plaintiff devoted to the think tank was *de minimis* and constituted only a minute percentage of Plaintiff's duties.

### 7. Duties as Regional Tire Manager

For a period of two or three months during the time he was parts manager, Plaintiff assumed the role of "regional tire manager" (also known as "technical tire manager"), although Plaintiff testified that his job title as parts manager never changed. Mr. Noland testified that this is a "very high level" position and that regional tire managers "own their region as it related to tires, so any issues, be it big or small, relating to tires in that region goes through them first." In this role, Plaintiff testified that he looked into problems with vendors – such as vendors cheating Defendant out of money or charging Defendant too much money for tires. If Plaintiff found a potential problem, he would report it to his superior, at which time Plaintiff's involvement ended. While acting as the technical tire manager, Plaintiff also spent a couple hours per day training his replacement in the parts department (*e.g.*, showing him how to do a purchase order or ship a part). Mr. Noland testified that while Plaintiff held the position of regional tire manager, Plaintiff made a recommendation that was ultimately implemented by Defendant:

12

Plaintiff recommended a vendor change after discovering "issues" with a vendor.[2]  Also while serving as a regional tire manager, Mr. Mumm testified that Plaintiff made a recommendation on a new tread design for the Marquette, Michigan region; although Plaintiff's idea was tested by Defendant, ultimately it was not implemented.

The Court finds that Defendant has proven that Plaintiff exercised some discretion and independent judgment while performing the job of regional tire manager to the extent it was part of Plaintiff's job to make recommendations regarding changes in Defendant's practices.  The Court finds that recommending policy changes involves "the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered."  29 C.F.R. § 541.202(a).  However, the record reflects that Plaintiff only made two recommendations while he was parts manager: the vendor change to which Mr. Noland testified and the tread design change to which Mr. Mumm testified.  The fact that these were the only recommendations made by Plaintiff suggests that it was not one of Plaintiff's primary duties during the short time he served as regional tire manager to recommend policy or practice changes.  In any event, Plaintiff only served in this position for two or three months, a relatively small percentage of the approximately two and a half years in which he served as parts manager.

The Court further finds that Defendant failed to prove that Plaintiff exercised discretion and independent judgment with regard to the remainder of the duties he performed while serving as regional tire manager. Regarding Plaintiff's training function, Defendant has not shown that Plaintiff did anything other than convey Defendant's guidelines or standards to the trainee.  In other words, there is no evidence that Plaintiff's training function involved any weighing of options and decision-making by Plaintiff.  Likewise, there was no evidence adduced at trial

---

[2] Mr. Noland also testified that Plaintiff recommended a change in the type of tire used on trucks in northern Michigan.  However, that recommendation was made before Plaintiff became a parts manager.

13

demonstrating that Plaintiff's role in investigating vendors involved the exercise of discretion and independent judgment. For these reasons, the Court finds that Defendant has proved by a preponderance of the evidence that Plaintiff exercised discretion and independent judgment in recommending changes to Defendant regarding it practices, but did not otherwise exercise discretion or independent judgment in his brief role as regional tire manager.

### 8. Training Employees

Mr. Mumm testified that, while Plaintiff was a parts manager, Plaintiff traveled to Defendant's new Marquette, Michigan location and assisted in setting up that location, helped stock parts, and helped organize the parts department at that location. When asked to elaborate on how Plaintiff helped in setting up the location, Mr. Mumm testified:

> [W]hen we were there we would set up the shelving, stock the parts on the shelves, mark the part numbers on the shelves, making sure inventory counts were correct. Also the mins and maxes . . . it's an automatic order system. If you have ten on the shelf and you use four, and your minimum is set at a certain point, it will automatically reorder.

After the facility was set up, Mr. Mumm testified that Plaintiff would occasionally be called upon to train employees at the Syracuse location. Mr. Mumm also testified that Plaintiff helped correct problems at Defendant's facility in Syracuse, New York. Mr. Mumm explained that the Syracuse location was "relatively new," "[t]here were new people involved in that location who weren't well versed on the parts department, inventory was in shambles." Mr. Mumm testified that Plaintiff "assisted in correcting those issues."

Moreover, Mr. Mumm and Mr. Noland both testified that part of Plaintiff's job was to train Defendant's employees. In particular, Mr. Mumm testified that Plaintiff trained employees in the parts room and tire department "on procedures and how to do tire inventories for the tire

14

guys" and on "how to do lower-end parts duties." Mr. Noland testified that Plaintiff trained new employees regarding the policies and procedures discussed in tire university.

The Court finds that Defendant failed to satisfy its burden of proving that Plaintiff exercised any discretion or independent judgment in assisting at the Marquette or Syracuse locations, or in training employees at those locations and elsewhere. Nothing in Mr. Mumm or Mr. Noland's testimony suggests that – in assisting and resolving problems at the Marquette or Syracuse locations, or in training employees – Plaintiff "compar[ed] and the evaluat[ed] . . . possible courses of conduct" and "ma[de] a decision after the various possibilities [were] considered." 29 C.F.R. § 541.202(a). In sum, the evidence suggests that Plaintiff simply imparted his knowledge on his trainees. If this involved any decision-making, Defendant failed to satisfy its burden of proving it. For these reasons, the Court finds that Defendant failed to meet its burden of establishing that Plaintiff's training functions involved the exercise of discretion or independent judgment.

### 9. Ordering Supplies

Mr. Mumm testified that Plaintiff was responsible for ordering supplies that were consumed by Defendant's employees on a daily basis, such as shop supplies, janitorial supplies, sand paper, toilet supplies, safety glasses, and other similar consumables. However, Plaintiff did not have the authority to decide what vendors Defendant would purchase these items from or what type of products to purchase; Plaintiff's role was limited to initiating and handling the re-ordering process as supply-level diminished. Mr. Mumm testified that Plaintiff would complete the purchase order for these items and Mr. Mumm would approve it.

The Court finds that Defendant failed to satisfy its burden of proving that Plaintiff exercised any discretion or independent judgment in ordering supplies. The evidence reflects

15

that Plaintiff would complete a purchasing order, subject to Mr. Mumm's final approval, simply when it was necessary to do so. There was no weighing of options and decision-making involved in this process, as Plaintiff did not have discretion to choose vendors or the type of supplies to order; rather, the decision to re-order supplies was dictated by the supply-level on hand – when supply was low, Plaintiff's responsibility was to order more.

### B. Summary - The Administrative Exemption of 29 U.S.C. § 213(a)(1) Does Not Apply

Throughout trial, the Court heard repeated testimony that Plaintiff was an exceptional employee and highly skilled at his job. However, this testimony is irrelevant for the present purposes because the Court's analysis is limited to discerning whether Plaintiff's primary duties included the exercise of discretion and independent judgment, as that phrase is defined in 29 C.F.R. § 541.202. Defendant failed to show that Plaintiff's job duties as parts manager involved any significant degree of discretion or independent judgment. To the extent Plaintiff's position involved the exercise of any degree of discretion or independent judgment, it was extremely minimal, rising nowhere near the level of his "primary" job duties. For these reasons, the Court finds that Defendant failed to satisfy its burden of proving that Plaintiff's primary duties as parts manager included the exercise of discretion and independent judgment.[3] Thus, the administrative exemption of 29 U.S.C. § 213(a)(1) does not apply in this case, and Defendant was required to compensate Plaintiff for hours worked in excess of forty-hours per week while Plaintiff held the position of parts manager.

---

[3] Because Defendant failed to satisfy its burden of proving that Plaintiff's primary duty as parts manager involved the exercise of discretion and independent judgment with respect to matters of significance, the Court does not address the other disputed element of the 29 C.F.R. § 541.200(a) framework – whether Plaintiff's primary duty was the performance of office or non-manual work directly related to the management or general business operations of Defendant or its customers.

## IV.  STATUTE OF LIMITATIONS

Ordinary violations of the FLSA must be commenced within two years after the cause of action accrued; however, "willful" violations of the FLSA may be commenced within three years after the cause of action accrued.  *See* 29 U.S.C. § 255(a); *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 129, 108 S. Ct. 1677, 1679 (1988).  A violation is "willful" if "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the [FLSA]."  *McLaughlin*, 486 U.S. at 133, 108 S. Ct. at 1681.  The plaintiff bears the burden of proving willfulness.  *Schneider v. City of Springfield*, 102 F. Supp. 2d 827, 835 (S.D. Ohio 1999).

The complaint in the present case was filed on August 29, 2013.  Plaintiff assumed the title of parts manager effective January 16, 2011.  If the two-year limitations period applies, any claim for unpaid overtime before August 29, 2011 is time-barred.  This would mean that Plaintiff could not recover for any unpaid overtime worked while he was a parts manager from January 16, 2011 until August 28, 2011.  However, if the three-year limitations period applies, Plaintiff could recover all unpaid overtime for the entire time that he served as parts manager.

The Court finds that Plaintiff failed to meet his burden of showing that Defendant willfully violated the FLSA.  The Court heard no testimony during the trial in any way suggesting that Defendant knew or showed a reckless disregard for the matter of whether its decision not to compensate Plaintiff for overtime hours was prohibited by the FLSA.

Plaintiff argued during closing arguments that Defendant willfully violated the FLSA, employing the following reasoning: (1) Plaintiff was paid overtime before he became parts manager; (2) Defendant knew it had to pay Plaintiff overtime before he became parts manager by virtue of the fact that it paid Plaintiff overtime at that time; (3) Because Plaintiff's job duties did

not significantly change when he became a parts manager, Defendant should have known that it was required to continue paying Plaintiff overtime. The Court rejects this argument. The Court does not find that Plaintiff's job duties stayed exactly the same when he became parts manager; it finds only that Plaintiff's primary duties as a parts manager did not involve the exercise of discretion or independent judgment.[4] In any event, the circumstances of the present case are not remotely similar to cases in which willfulness was found. *See, e.g.*, *Herman v. Palo Group Foster Home, Inc.*, 183 F.3d 468, 474 (6th Cir. 1999) (willfulness standard satisfied where employer had actual notice of FLSA requirements, had been investigated for violations twice in the past, paid unpaid overtime wages, received explanations of what was required to comply with the Act, and assured Department of Labor that it would comply in the future); *Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962, 967 (6th Cir. 1991) (willfulness standard satisfied where employer had actual notice of FLSA requirements by virtue of earlier violations, its agreement to pay unpaid overtime wages, and its assurance of future compliance with FLSA). Therefore, the two-year limitations period applies and Plaintiff is barred from recovering any unpaid overtime for hours worked before August 29, 2011.

## V. LIQUIDATED DAMAGES

Employers who violate the FLSA are generally liable for liquidated damages: "Any employer who violates the provisions of section 206 or section 207 of this title shall be liable to the employee . . . affected in the amount of . . . their unpaid overtime compensation . . . and in an

---

[4] For example, Mr. Mumm testified that Plaintiff's role in the end-of-year inventory changed when he became parts manager. In particular, Mr. Mumm testified that as a parts journeyman, Plaintiff's role was limited to "counting parts, entering the information into the system, and creating variance reports," but when he became a parts manager he would do those same things plus "directed who does what." In addition, Mr. Mumm testified that Plaintiff became more involved in purchasing consumables when he became a parts manager, and there is no evidence that Plaintiff performed the training duties that he performed while he was parts manager prior to assuming that position.

18

additional equal amount as liquidated damages." 29 U.S.C. § 216(b). Liquidated damages "are compensation, not a penalty or punishment," *Elwell v. University Hospitals Home Care Services*, 276 F.3d 832, 840 (6th Cir. 2002) (internal quotations omitted), and are considered "the norm." *Martin v. Indiana Michigan Power Co.*, 381 F.3d 574, 584 (6th Cir. 2004). However, a district court has discretion not to award liquidated damages "if the employer shows to the satisfaction of the court that the act or omission giving rise to [the violation] was in good faith and that [the employer] had reasonable grounds for believing that [the] act or omission was not a violation of the [FLSA]." 29 U.S.C. § 260. The employer's burden in this regard is "substantial":

> This burden on the employer is substantial and requires proof that the employer's failure to obey the statute was both in good faith and predicated upon such reasonable grounds that it would be unfair to impose upon it more than a compensatory verdict. In the absence of such proof, however, a district court has no power or discretion to reduce an employer's liability for the equivalent of double unpaid wages.

*Elwell*, 276 F.3d at 840 (internal quotations, citations, and brackets omitted). Because Defendant in the present case has not attempted to surmount its burden of showing that liquidated damages are inappropriate, the Court finds that Plaintiff is entitled to liquidated damages.

### VI. CONCLUSION

For the reasons stated above, the Court finds that (1) the administrative exemption of 29 U.S.C. § 213(a)(1) does not apply in this case, and that Defendant violated the FLSA in failing to compensate Plaintiff for hours worked beyond forty hours per week while he served as parts manager from January 16, 2011 until July 12, 2013; (2) Plaintiff failed to prove that Defendant's FLSA violation was willful, and thus Plaintiff is barred from recovering any unpaid overtime for hours worked before August 29, 2011; and (3) Plaintiff is entitled to liquidated damages in the amount of the unpaid overtime compensation due to him.

Within ten days of today's date, the parties shall attempt in good faith to agree on the amount of damages due to Plaintiff, given the Court's rulings. Within this ten-day time frame, counsel shall apprise the Court of the result of the parties' damages discussions. If an agreement is reached, the parties shall submit a proposed final judgment for the Court's consideration. In the event an agreement is not reached, the Court will issue an appropriate order at that time.

**SO ORDERED.**


Dated: June 12, 2014				s/PATRICK J. DUGGAN
						UNITED STATES DISTRICT JUDGE